James **MILLER**, Appellant,

v.

**UNITED STATES DEPARTMENT OF STATE**, Appellee.

No. 84–5161

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1985.

Decided Dec. 30, 1985.

Rehearing Denied Feb. 14, 1986.

Gary Weissman, Minneapolis, Minn., for appellant.

Susan Sleater, D.J., Civ. Div., Washington, D.C., for appellee.

Before ROSS, McMILLIAN, and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

This case arises under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Plaintiff James Miller requested certain information from the State Department. When, after the passage of a year, he had received only a handful of documents, and repeated inquiries to Department officials had borne no fruit, he filed this suit in the District Court,[1] seeking injunctive relief against the Department and certain named

---

1. The Hon. Robert G. Renner, United States District Judge for the District of Minnesota.

employees[2] and also recovery of his costs of suit, including legal fees. After receiving evidence in the form of affidavits, the District Court granted summary judgment to the State Department on the ground that its response to Miller's request had been adequate under the statute. The District Court also denied Miller recovery of his legal fees. From that order, plaintiff appeals. We affirm as to the grant of summary judgment but reverse with respect to attorney's fees and remand for further consideration in the District Court.

## I.

Plaintiff Miller, an amateur historian, requested on 23 July 1981 the following information from the State Department:

(a) All State Department documents relating to the attack on the *U.S.S. Liberty* on 8 June 1967 by Israel.

(b) Any documentary evidence which demonstrates that this attack *wasn't* deliberate.

Internal documents and documents between the U.S. and Israel are both requested.... I assume that there were documents through Dec. 1980 when Israel agreed to compensation for the *U.S.S. Liberty* itself.

Correspondence involving compensation to victims of this attack is not requested.

Appendix at 7.[3]

On 21 August 1981, the State Department advised Mr. Miller that a search was under way for the documents which he had requested. During December of that year, Miller twice called the State Department to check on his request. During at least one of those conversations, he mentioned an earlier FOIA request on the same subject by one James Ennes. On 15 January 1982, after he had written the Department complaining of the delay in processing his request, he was informed that the Ennes file (containing 163 documents) had been located. The State Department employee who wrote him forwarded seven of the documents from that file and stated that any other releasable documents would follow as soon as the file was organized. The official indicated that since the Ennes request had been broader than Miller's,[4] few of the papers would be responsive to Miller's request. Miller was also told at this time that a search had been initiated several months earlier for documents related to Israeli compensation for the loss of the ship. (This information would have been outside the scope of the 1977 Ennes request, and therefore would not have been in the file assembled for it.)

On 26 February 1982, Miller wrote the State Department requesting the entire contents of the Ennes file[5] that defendants said they had located, and indicating his intention to file an appeal if the documents were not released by 31 March 1982. On 7 April 1982, after hearing nothing more from the State Department on his request, Miller filed an appeal with the Department under 5 U.S.C. § 552(a)(6). Acknowledging his letter on 21 April 1982, the Department declined to process his appeal because the requested material had not been "formally denied" to him. In this letter, the Department explained its tardiness as the result

---

**2.** The District Court dismissed the complaint as to the individual defendants, holding that only the Department of State itself is a proper defendant in this FOIA action. Plaintiff does not contest this holding on appeal.

**3.** The *U.S.S. Liberty,* a United States Navy vessel, was bombed, strafed, and torpedoed by units of the Israeli Defense Force on 8 June 1967. Thirty-four members of the American military were killed and 75 were wounded in the incident, which was later held to have been an accident.

**4.** Mr. Ennes, who was injured in the *Liberty* incident, had requested personal information on his claim under the Privacy Act (5 U.S.C. § 552a), and had also requested information on individual compensation claims, which was not within Miller's initial FOIA request.

**5.** Defendant State Department makes much of the "confusion" engendered by this change in Miller's request. However, as appellant pointed out in oral argument, the alteration in the request appears to have been an attempt by Miller to accommodate to the difficulties which the Department appeared to be having in sorting out the medical claims documents in the Ennes file.

of "an imbalance of requests and available resources." Miller heard no more from the Department until after he filed this lawsuit in the District Court on 23 June 1982.

Miller's complaint sought (1) a declaration that the defendants' failure to respond promptly to his FOIA request constituted a denial of the documents and estopped them to assert that he had not exhausted his administrative remedies; (2) a mandatory injunction compelling the defendants to release the documents which he had requested; (3) production of an itemized index identifying each document withheld under an exemption to the Act, and justifying such withholding; (4) recovery of attorneys' fees and costs under § 552(a)(4)(E); and (5) that the District Court order the Office of Personnel Management to investigate the defendants' "arbitrary, capricious, and dilatory behavior" for the purpose of considering whether disciplinary measures might be appropriate against individual State Department employees, as authorized by 5 U.S.C. § 552(a)(4)(F).

Three months after this complaint was filed, the State Department provided Miller with copies of 56 documents from the previously-released "Ennes" file. After Miller filed a motion for a pretrial conference, the defendants released a total of 231 additional documents and other agencies released four documents which had been referred to them by the defendants. All of these documents were in addition to the ones which had been released to Mr. Ennes under his earlier and "broader" request under FOIA and the Privacy Act. In February 1983, Miller's motion for discovery was heard. Release of 31 additional documents followed, even though the defendants resisted the motion for discovery. A Miller motion to compel discovery in April 1983 was followed by three more documents. In May 1983 the defendants moved for summary judgment and averred that "all of the infor-

mation relevant to this request is being released in full."[6] Yet at least 35 additional documents trickled in in succeeding releases by the State Department. By the end of September 1983, over two years after Miller's initial FOIA request and fifteen months after filing of this lawsuit, the State Department had released to him a total of 367 documents.[7]

On 27 April 1984, the Magistrate filed his report and recommendation (App. at 135–50), to which Mr. Miller objected in a detailed brief. On 11 July 1984, the District Court entered an order granting summary judgment to the defendants and denying Miller the recovery of attorney's fees.

## II.

Appellant appeals the grant of summary judgment on two grounds: First, that the District Court erred in finding that plaintiff had failed to raise a substantial issue of fact as to the adequacy of the State Department's search for the documents which he had requested and as to the good faith of the government affidavits which explained the search and the delays which accompanied it; and second, that the Court erred in accepting the State Department's justification for withholding all or part of some documents under the FOIA's national-security exemption.

## A.

 Summary judgment is available to the defendant in a FOIA case when the agency proves that it has fully discharged its obligations under FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester. *Weisberg v. U.S. Department of Justice,* 705 F.2d 1344, 1350 (D.C.Cir.1983). In order to discharge this burden, the agency

---

6. First Friedman Affidavit, App. at 25.

7. This total is derived from our examination of the portion of the record which is available to us in Appellant's Appendix. The exact total is somewhat uncertain. Miller states in his brief (at 24) that he ultimately received 362 doc-

uments. However, in his Objections to the Magistrate's Report (App. at 151–89), he uses three different figures, ranging from 363 to 375. The confusion could have resulted from duplicate documents or from re-releases.

"must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." *National Cable Television Ass'n, Inc. v. Federal Communications Comm'n*, 479 F.2d 183, 186 (D.C.Cir.1973). The adequacy of an agency's search for requested documents is judged by a standard of reasonableness, i.e., "the agency must show beyond material doubt ... that it has conducted a search reasonably calculated to uncover all relevant documents." *Weisberg*, 705 F.2d at 1351. But the search need only be reasonable; it does not have to be exhaustive. See, *e.g.*, *Shaw v. U.S. Department of State*, 559 F.Supp. 1053, 1057 (D.D.C.1983). An agency may prove the reasonableness of its search through affidavits of responsible agency officials so long as the affidavits are relatively detailed, nonconclusory, and submitted in good faith. *Goland v. Central Intelligence Agency*, 607 F.2d 339, 352 (D.C.Cir.1978), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). It was the intent of Congress that agency affidavits be accorded substantial weight in national-security cases, see S.Rep. No. 1200, 93d Cong., 2d Sess. 12, *reprinted in* 1974 U.S.Code Cong. & Ad.News 6267, 6285, 6290. "[T]hese affidavits are equally trustworthy when they aver that all documents have been produced or are unidentifiable as when they aver that identified documents are exempt." *Goland*, 607 F.2d at 352.

■ Despite this weight to be accorded to agency affidavits, the burden remains on the government to demonstrate that it has thoroughly searched for the requested documents where they might reasonably be found. If the agency has not made this showing, then the requester can avert a motion for summary judgment merely by demonstrating some reason to think that the document would have turned up if the agency had looked for it, e.g., by showing that the document originated with the agency or that the agency is set up to retrieve just that kind of document. See *Weisberg*, 705 F.2d at 1351. But once the agency has shown by convincing evidence that its search was reasonable, i.e., that it was especially geared to recover the documents requested, then the burden is on the requester to rebut that evidence by a showing that the search was not in fact in good faith. *Id.* Summary judgment would be improper if the adequacy of the agency's search were materially disputed on the record, for such a dispute would indicate that material facts were still in doubt.

■ The State Department in this case furnished affidavits by responsible officers setting out in detail the search procedure used in responding to Miller's request.[8] As these officials explained, the State Department maintained no separate file on the subject *"U.S.S. Liberty,"* at least prior to 1973. Before that date, State Department Central Files were indexed by fairly broad "concept terms." In order to retrieve documents on the *U.S.S. Liberty* incident, department personnel searched manually through the subject-matter files which were most likely to contain such material. Two such sets of subject-matter files were initially screened for *Liberty* documents: "POL 27 Arab-Israel" and "PS 8-4 U.S.-Israel." "POL 27" indicated "military operations"; "PS 8-4" covered "seizures and damages."[9] The search covered these files for the years 1967 to 1973. "The POL 27 Arab-Israel" file for the years 1967 to 1969 alone contained about 20,000 documents;[10] presumably the other files were also large. As documents relating to the *Liberty* incident were located in these files, they were removed for more detailed screening; each one was assigned a sequence number for the purposes of this FOIA request. Ultimately, a total of 619

---

**8.** See, *e.g.*, First affidavit of Frank M. Machak, App. at 58–81; Second affidavit of Jack Friedman, App. at 83–99.

**9.** First Machak affidavit, App. at 61.

**10.** *Id.*

documents were retrieved and numbered as a result of this and subsequent searches.[11]

Documents which had entered the State Department Central Files subsequent to 1973 were cross-indexed in a computer system by subject-matter, proper name, organization, and other categories.[12] For these materials, retrieval was possible under the category *"U.S.S. Liberty"* (assuming, of course, that all documents had been properly cross-indexed when they were first placed in the files) without laborious manual screening. In addition, the Department searched organizational files outside of the Central Files[13] and located a few *Liberty*-related documents, which were also included within the sequence numbered 164–619.

After retrieval of documents from the files, each document was reviewed to ascertain whether it was within the scope of Mr. Miller's request.[14] During this substantive review, documents which did not in fact relate to the *Liberty* incident were set aside, as were documents which were not responsive to Miller's request, such as individual compensation claims.[15] Documents which were duplicated in the file were also removed.[16]

After substantive review of the retrieved documents, each document was reviewed in order to determine whether it should be withheld under one of the statutory exemptions under the FOIA. Documents which were deemed to be withholdable were removed from the sequence. Ultimately, Mr. Miller received about 367 out of a numbered sequence of 619 pieces. The processing procedure outlined above explains, at least facially, the numbering gaps which the appellant points to as evidence of

"missing" and presumably unaccounted-for documents.

Since the State Department has provided affidavits which set out in detail and in non-conclusory terms the steps which the Department took in searching for the materials requested by Miller, it is incumbent on the appellant to raise a substantial and material factual issue in regard to the reasonableness of the search. This can be done either by contradicting the defendants' account of the search procedure or by raising evidence of the defendants' bad faith. See, *e.g.*, *Brinton v. Department of State*, 636 F.2d 600, 606 (D.C.Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981). Miller has sought to do this by (1) evidence of existing but unreleased and unaccounted-for documents; (2) evidence that the Department released a number of documents long after it had averred by affidavit that all responsive documents had been released; and (3) evidence of the Department's delay in responding to his request.

▮ Miller asserts that he has repeatedly identified for the State Department particular documents which were internally referred to in documents released to him. He argues that the fact that these referenced documents were not sent to him indicates an inadequate search on the part of the State Department. Essentially, he is attacking the competency of the search method because it did not uncover known and identified documents. However, the standard of reasonableness which we apply to agency search procedures does not require absolute exhaustion of the files; instead, it requires a search reasonably calcu-

---

**11.** The first 163 documents in the sequence were the "Ennes" file, which apparently had been maintained separately after Mr. Ennes's FOIA request in 1977. See App. at 75.

**12.** First Machak affidavit, App. at 61.

**13.** First Machak affidavit, App. at 74–75.

**14.** Second Friedman affidavit, App. at 84–86.

**15.** As noted above, Miller's initial FOIA request specifically excluded these materials. In Febru-

ary 1982, he amended his request to include all material which had been released under the Ennes request, but in August of that year indicated that he still did not want individual medical claims materials. See Second Friedman affidavit, App. at 86. However, when the plaintiff complained that the Department was deliberately withholding relevant material from the Ennes file, these medical claims documents were reprocessed and released to him. Third Friedman affidavit, App. at 104–05.

**16.** First Friedman affidavit, App. at 24.

lated to uncover the sought materials. The fact that a document once existed does not mean that it now exists; nor does the fact that an agency created a document necessarily imply that the agency has retained it. Thus, the Department is not required by the Act to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found; it is not necessary "to create a document that does not exist in order to satisfy a [FOIA] request." *Yeager v. Drug Enforcement Administration,* 678 F.2d 315, 321 (D.C.Cir.1982). Moreover, the filing system which an agency uses is designed in most instances to serve its internal needs; in responding to a FOIA request, the agency is required to make a diligent effort calculated to uncover the requested document but need not restructure its entire system in order to satisfy the request. See *McGehee v. Central Intelligence Agency,* 697 F.2d 1095, 1100 (D.C.Cir.1983), *modified in part on reh'g,* 711 F.2d 1076 (D.C.Cir.1983). The competence of a records search must be determined in relation to the circumstances of the case. If the appellant is able to show circumstances indicating that further search procedures were available without the Department's having to expend more than reasonable effort, then summary judgment would be improper. See *Founding Church of Scientology v. National Security Agency,* 610 F.2d 824, 834 (D.C. Cir.1979). The State Department here set out in detail the search methodology used to recover relevant documents. It explained that for documents filed before 1973 retrieval by reference was impracticable, although retrieval by subject matter (the method used) could be expected to locate relevant referenced documents. For documents generated after 1973, the Department was able to, and did, locate internally referenced material through comput-

er search. Appellant has not shown here that other reasonable means would have satisfied his request. He alleges that the search was insufficient because the Department did not do all that it could; we agree with the District Court, however, that it did all the Act required.

Miller also argues that the affidavits of State Department officials were internally contradictory and artfully contrived to mislead as to the existence of undisclosed documents. In particular, he points out that the State Department on more than one occasion during the course of this matter suggested or openly asserted that all relevant documents had finally been released— only to disgorge, upon further prodding, additional documents. For instance, on 15 January 1982, before this lawsuit was filed, the Department informed Mr. Miller that it had located 160 *Liberty* documents and that "[n]ot very many of these relate directly to the attack and the reasons for it."[17] Although this statement certainly carried the implication that there would not be many materials responsive to Mr. Miller's request, the statement when read in context clearly refers to the Ennes file, which subsequent affidavits showed was searched first by the Department in order to provide Miller with some documents he could use while the rest of the search was being completed.[18]

A subsequent statement in the first Friedman affidavit, which was filed with the defendants' motion for summary judgment, is more troublesome. Friedman indicated that of over 500 documents retrieved in the search, only 269 were responsive to the request[19] and that with the exception of one classified document, "all of the information relevant to this request is being released in full ..."[20] Clearly, the Department was stating here that the well was dry and that it had completed its search and released all that it could release. But over the next four months between 34 and

---

17. Blair P. Hall letter, App at 10.

18. First Machak affidavit, App. at 74.

19. See App. at 24. Apparently, the 269 documents did not include the "Ennes" documents previously released to Miller.

20. App. at 25.

40 additional documents came to light and were belatedly released to Miller. He asserts that the tardy release of these documents is evidence of bad faith on the part of the Department and that this evidence is sufficient to raise a factual issue and avert summary judgment.

█ While the discovery of additional documents is evidence that the search was not thorough, *Goland v. Central Intelligence Agency,* 607 F.2d 339, 367, 370 (D.C. Cir.1979) (opinion modified per curiam), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980), such discovery is not conclusive of agency bad faith. It may be indicative of administrative inefficiency, see *Perry v. Block,* 684 F.2d 121, 129 (D.C. Cir.1982), or it may, as in this case, indicate reluctant diligence by the agency under the goad of persistent litigation by a determined plaintiff. We note that the number of documents released after the Friedman declaration that all documents had been released is small when compared with the total; the record also shows that many of these documents were outside the scope of Mr. Miller's original request but were added later when he apparently broadened his request.[21] The Department's explanation of the release of these documents is plausible. The fact that they were in fact released after Mr. Miller broadened his request seems to us to be evidence of good faith and diligence rather than bad faith and dilatoriness. See *Goland,* 607 F.2d at 355.

Appellant points to the long delay he experienced in receiving these documents as more evidence of State Department bad faith. We agree that the Department's response to his FOIA request left something to be desired. The progress which was made in processing the request can at best be described as glacial, particularly before the lawsuit was filed.

The State Department explains its behavior as being the result of overwork or understaffing.[22] A large portion of the work of the Department personnel who process FOIA requests involves responding to information requests from the Department itself or from other government agencies. Approximately 24,000 such requests are processed each year. Since these requests are in the ordinary course of ongoing government operations, it is understandable that they receive priority processing. FOIA requests are dealt with in chronological order as they are received but after intragovernment requests are satisfied. Approximately 4,500 FOIA requests are received each year. Defendant claims that the crush of work has resulted in a continuous backlog of about 3,000 FOIA requests at any time, with resulting delays in the processing of individual requests.

Whether the backlog and delays result from understaffing or from misapplication of resources or from bureaucratic inertia is a matter of concern for State Department managers, but it is immaterial to our decision here, for none of these things by itself would constitute bad faith as to this plaintiff's request. Delay alone is significant only to the extent that evidence shows that the delay resulted from bad-faith refusal to cooperate. Appellant has shown us the delay and has concluded that it resulted from bad faith. However, that delay, when considered in the light of the ultimate disclosure of the documents which Miller requested and the State Department's tardy but eventually complete accounting of its search, is not enough to impugn the credibility of the affidavits which the Department submitted. Once the agency has

---

**21.** See First Machak affidavit, App. at 63–64 and *passim* ; Second Friedman affidavit, App. at 86; and Third Friedman affidavit, App. at 104–05. Thirteen of these documents were Department responses to Congressional inquiries on behalf of constituents. They were initially thought to have been outside the scope of Miller's request. Two were similar responses to inquiries from citizens. Three were letters from Congressmen, which arguably were also outside the scope of the original request. Six were documents from the Ennes file which dealt with injury and death claims. One document was initially thought to be a duplicate. The remainder were Ennes documents which through administrative error were not screened for release initially.

**22.** First Machak affidavit, App. at 59.

demonstrated that it has made a reasonably thorough search in the places where the documents are likely to be found, and has accounted for the documents, and the requester has failed to show that such a search was not made, then the federal courts have no further statutory duty to perform under the Act.[23] We agree with the District Court that the defendants have documented an adequate search under the Act, and affirm the summary judgment on that point.

### B.

Miller asserts that the State Department improperly exempted from disclosure twelve documents on the basis of FOIA exemption (b)(1), the national-security exemption.[24] He states that the Department applied the wrong Executive Order in classifying these documents and claims that the fact that final classification in some instances did not occur until 1983, some sixteen years after the *Liberty* incident, points to agency duplicity. He appeals the District Court's order declining to order production of the classified documents for an *in camera* review of the propriety of the classification decision.

 The national-security exemption is designed to accommodate the government's need for protecting sensitive materials to the general duty to disclose imposed by FOIA. Since the exemption runs counter to the dominant objective of the Act, the exemption is to be narrowly construed. *Davis v. Central Intelligence Agency,* 711 F.2d 858, 861 (8th Cir.1983), *cert. denied,* 465 U.S. 1035, 104 S.Ct. 1307, 79 L.Ed.2d 705 (1984). When an agency seeks to withhold release of government documents under this exemption, the court is required to determine *de novo* the propriety of the agency's decision. See 5 U.S.C. § 552(a)(4)(B). But since the agency has unique insight into the adverse effects which might result from public disclosure

of certain classified information, substantial weight must be accorded to its affidavits justifying exemption. *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C. Cir.1981). However, the burden remains on the government to prove the propriety of the exemption. Since the government is in the best position to explain its exemption of particular documents and the party seeking disclosure presumably does not know the contents of those documents, the government cannot adequately carry its burden through "barren assertions" that the document is exempt. See *Founding Church of Scientology v. National Security Agency,* 610 F.2d 824, 831 (D.C.Cir. 1979). Instead, it generally is necessary for the agency to provide affidavits which justify the claimed exclusion of each document by correlating the purpose for exemption with the actual portion of the document which is alleged to be exempt. See *Vaughn v. Rosen,* 484 F.2d 820, 827–28 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). In the present case, the State Department provided a series of affidavits explaining in detail the reasons why twelve of the documents sought by Mr. Miller contained material which might damage the national security if it were released. This is sufficient to carry the Department's burden of proof unless the plaintiff can show that the affidavits were submitted in bad faith. *Cox v. United States Department of Justice,* 576 F.2d 1302, 1312 (8th Cir.1978). No such showing is made here.

Miller claims that the Department applied the wrong Executive Order in determining that these documents were not subject to disclosure. The Order in effect when Miller first made his request (E.O. 12065, 3 C.F.R. 190 (1979)) contained, with some qualifications, an automatic declassification schedule of six years for all documents except those marked "top secret."

**23.** This is apart from the matter of attorneys' fees, which we take up in Part III *infra.*

**24.** 5 U.S.C. § 552(b)(1)(A) exempts from disclosure matters "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy ..."

*Id.* at § 1–4, 3 C.F.R. at 193. However, the Department applied Executive Order 12356, 3 C.F.R. 166 (1983), which removed the automatic declassification schedule and left the decision to declassify to the discretion of agency officials. *Id.* at § 3.1, 3 C.F.R. at 171–72.

■ We find Miller's objections on this point to be insubstantial. While the courts apply the Executive Order which was in effect when the classifying official finally acted, see *Lesar v. United States Department of Justice,* 636 F.2d 472, 480 (D.C.Cir.1980), the agency has the power to reclassify at any time. *Id.* The agency may also apply a new Executive Order which becomes effective during pendency of the lawsuit, since to deny it that power would defeat the purpose of the FOIA exemption by forbidding the government from responding to changes in national-security needs. See *Afshar v. Department of State,* 702 F.2d 1125, 1136 (D.C.Cir. 1983). Miller points out that the State Department never acted to classify some of these documents until after they were requested by him, some sixteen years after the *Liberty* incident. He argues, with some logic, that the statement of the Department that these documents contain sensitive national-security material ought not be accepted as trustworthy when the same documents apparently lay in the files unexamined for such a long period. The inference is not persuasive enough to carry the day. It would be unwise to forbid the agency to reexamine documents which may have been overlooked at an earlier time, since to do so would run counter to the purpose of the exemption. The mere fact of delay in classification by an agency is insufficient to justify disclosure of information which may be damaging to the national security, so long as the substantive standards of the appropriate Executive Order were applied by the agency when the decision to classify was ultimately made. See *Baez v. United States Department of Justice,* 647 F.2d 1328, 1332–33 (D.C.Cir.1980).

■ We hold that the District Court properly applied the law in granting the defendants' motion for summary judgment and in denying plaintiff's motions for *in camera* inspection of classified documents.

### III.

Even though we hold that the plaintiff has not shown a disputable factual issue as to whether the defendants responded in good faith to his request, the conclusion seems inescapable that but for the plaintiff's persistent prosecution of his claim he would not have received the documents which he did. A review of the chronology of this case is illuminating. In January of 1982, the plaintiff received seven documents which had been released to James Ennes, an earlier FOIA requester. The State Department indicated at that time that screening of the file was almost complete and that few other documents would be responsive to Miller's request, noting that the Ennes request had been broader than Miller's. Mr. Miller received no more documents from the Department until after he filed suit in June of 1982. Then, in September of that year he received 56 additional documents from the Ennes file. In October, plaintiff made demand for a pretrial conference, and in November he received 72 documents, these being material that had never been released to Ennes. One hundred sixty-one new documents arrived in January of 1983 as Miller continued to press his lawsuit. As pretrial motions and briefs were filed, more documents were disgorged, even after the defendants had repeatedly stated that they had sent all that were responsive. In all, Miller received 367 documents from the State Department prior to the District Court's decision in this case; all but seven of these were received after he filed the suit. It is significant that Mr. Miller ultimately received over double the number of documents that Mr. Ennes did, even though the Ennes request was perceived by the State Department as broader than Miller's. We note that Ennes also filed a lawsuit over his FOIA claim, but that he pressed his suit *pro se.*

] Congress amended the FOIA in 1974 to authorize the award of attorneys' fees to parties who had "substantially prevailed."[25] In doing so the Congress left to the traditional equitable discretion of the trial court the decision whether such fees should be awarded in any particular case. *Fenster v. Brown,* 617 F.2d 740 (D.C.Cir. 1979). However, the discretion of the District Court is not absolute. Once a plaintiff has shown himself to be "eligible" for attorneys' fees, the court must determine whether he is "entitled" to such an award, see *Church of Scientology v. Harris,* 653 F.2d 584, 587 (D.C.Cir.1981), and this determination is reviewable for abuse of discretion.

] A FOIA claimant is eligible for an award of attorneys' fees if he has substantially prevailed through his lawsuit. It is not necessary that the claimant have received a favorable judgment in order to have prevailed. But if the plaintiff has not received favorable judgment, then he must show, first, that prosecution of the action could reasonably be regarded as necessary to obtain the information, and, second, that the existence of the lawsuit had a causative effect on the release of the information. *Ginter v. Internal Revenue Service,* 648 F.2d 469, 471 (8th Cir.1981). The facts set out above support a finding that this suit was necessary to force the release of the documents. The facts also support a finding that Mr. Miller's persistent litigation of his FOIA claim was the principal cause of the Department's eventual diligence in releasing these documents. This conclusion is not inconsistent with our holding in Part II, *supra,* that the State Department in the end responded adequately and in good faith to Mr. Miller's request, since that holding deals with the adequacy and good faith of the Department's belated search *after* it

was prodded into action by this lawsuit. In these circumstances, Mr. Miller is eligible for reasonable attorneys' fees under the Act, and the District Court's implicit finding to the contrary is not plausible.

] Having found that Miller was eligible for attorneys' fees, the court is required to determine his entitlement by considering all relevant factors. This decision is ultimately within the sound discretion of the trial court, but that discretion can be abused if the court fails to consider properly the relevant factors and document its reasoning sufficiently to provide a basis for decision. *LaSalle Extension University v. FTC,* 627 F.2d 481, 485 (D.C.Cir.1980). Among the factors which the court should consider when determining a prevailing litigant's entitlement to attorneys' fees under FOIA are: (1) the benefit to the public to be derived from the case; (2) commercial benefit to the complainant; (3) the nature of the complainant's interest in the records which he seeks; and (4) whether the government's withholding of the records had a reasonable basis in law.[26] *Id.* at 483.

Probably the most important consideration in determining entitlement to fees in a FOIA case is the benefit to the public which is to be derived from release of the information sought. The underlying purpose of FOIA is to ensure that government is conducted in the open. Congress intended the public to have the maximum access to government records that was consistent with maintenance of national security and orderliness of government operations. Media requesters have an obvious claim to acting in the public interest, but that role is not to be denied to private parties such as Mr. Miller and other researchers and writers who seek to shed light on the actions of the government and the underlying circum-

---

**25.** This passage reads in full: "The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E).

**26.** The source of these criteria is S.Rep. No. 854, 93d Cong., 2d Sess. 19 (1974), *quoted in Fenster*

*v. Brown,* 617 F.2d 740, 742 n. 4 (D.C.Cir.1979). Although the criteria were deleted from the bill in its final form, the deletion apparently resulted from a sense that existing law already recognized these factors and that a formal reiteration of them in the statute would be unnecessary. See *Fenster,* 617 F.2d at 742–43 n. 4.

stances of newsworthy events. The defendants protest that there is minimal public value in disclosure of information related to the *Liberty* incident, since it happened over eighteen years ago. Appellees' Brief 43–44. We strongly disagree. There is considerable public value in any disclosure which adds significantly to the fund of information which citizens may use in making political choices, see *Blue v. Bureau of Prisons*, 570 F.2d 529, 533–34 (5th Cir. 1978), and litigation which results in such disclosures is additionally beneficial when it causes a government agency to take seriously its responsibilities under FOIA. *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1366 (D.C. Cir.1977).

A second factor, the commercial benefit to the claimant, is an inverse of the first. To the extent that the requester seeks government information primarily for private gain, his FOIA action is a matter of his own concern and expense and not of advocacy to serve a public interest. It was not the purpose of Congress to subsidize essentially private disputes with the government. *Cuneo*, 553 F.2d at 1368. Since the appellees do not allege that Miller is pursuing any commercial advantage through his request for government information, this factor is also in Miller's favor.

Similarly, the third factor (the nature of the complainant's interest in the records) must be resolved in favor of the plaintiff. When the FOIA requester acts on behalf of an articulated public interest, or when he seeks information for disinterested scholarly purposes, he is more likely to be furthering the purposes of FOIA than when his primary interest is to advance a purely personal goal. See *Blue v. Bureau of Prisons*, 570 F.2d 529, 534 (5th Cir.1978); *Nationwide Building Maintenance, Inc. v. Sampson*, 559 F.2d 704, 712 (D.C.Cir. 1977). Appellees concede that Miller's interest in the records in this case is primarily scholarly. Appellees' Brief 44.

A fourth criterion which must be weighed in determining entitlement to fees is whether the government's withholding of the requested information had a reasonable basis in law. The State Department asserts that it had a sound reason for withholding the national-security material and certain other exempt documents (which are not subjects of this appeal). We agree with that contention, but it applies only to a few documents. The real issue here is whether the Department had a colorably reasonable legal basis for withholding for periods of up to two years the 360 or so documents which eventually were released as a result of this lawsuit. The Department has explained that these documents were not produced more quickly because of a combination of factors, including processing backlogs, confusion, and administrative error. While these reasons are plausible, and we do not find them to be evidence of bad faith on the part of the Department, they are practical explanations, not reasonable legal bases. The FOIA does not contain a statutory exception for administrative inefficiency. When a private citizen is obliged to seek legal services in order to wrest from the government information which the government had no legal reason to withhold from him, he is entitled under the Act to be reimbursed for the cost to which he has been put.

We hold that Mr. Miller substantially prevailed in his objective of acquiring from the State Department the documents which were the subject of his FOIA request. He prevailed because his vigorous prosecution of this lawsuit compelled the Department to take his request seriously. Having prevailed, Miller was eligible to recover attorneys' fees and the costs of his suit. We conclude that the District Court abused its discretion in its assessment of the four factors relevant to the award of fees. We therefore remand to the District Court for a determination of the proper amount of fees and costs to be awarded.

Affirmed on the merits, vacated and remanded with respect to attorneys' fees and costs.